Good morning. We have a number of issues here, and you're welcome to address any and all of them. I'll just tell you from my perspective, one that I'm interested in is the poverty and the prejudice that may or may not flow from that issue. Certainly, Your Honor. For the record, Robert Rexrod, federal defenders for the appellant Jose Alvarado. Turning first to the issue of the poverty evidence that was introduced at Mr. Alvarado's trial and then argued substantively during the government's closing, I think it's important when discussing this issue, perhaps some of the briefs were not the most clear on the chronology of how this all occurred, I think it's important to know exactly how the evidence came in. First of all, the issue of poverty and whether poverty could be argued as evidence of guilt was raised in an in limine motion by the defense. The government actually responded to that in limine motion saying that it was irrelevant and they weren't going to introduce the evidence, and for that reason the district court decided that that motion in limine was moot. The first instance when evidence of Mr. Alvarado's poverty or potential financial need came into evidence was on the direct examination of Agent Stortz during the government's case in chief. And when relating what Agent Stortz alleged was Mr. Alvarado's statement to him at the time of Mr. Alvarado's arrest, Agent Stortz testified that Mr. Alvarado spoke of his mother's illness and potential hospital bills. So the first time that evidence came in was during the government's case in chief on the direct examination of Agent Stortz. And that was objected to, as I recall? No. My recollection is that there was no objection made at that point. I would, however, again reiterate that there was a motion in limine, and based on the government's response in their motion in limine, I did not try this case. I was not trial case counsel, and I can't say what was going through trial counsel's mind, but I would imagine that came out kind of quickly and might have been quite a bit of surprise given the in limine rulings. The second time that the evidence came in was during the cross-examination of Agent Stortz during the government's case in chief. And I'm sorry if some of my language is awkward, but Agent Stortz did testify in rebuttal, and I'm just trying to make sure when the evidence came in. During cross-examination, defense counsel did ask him, Agent Stortz, briefly whether Mr. Alvarado talked about his mother being in the hospital. And it was known to Agent Stortz before interrogating Mr. Alvarado. The next point at which evidence came in was that the defense was trying to get the fact out that Agent Stortz knew about Mr. Alvarado's mother's medical condition before going into the interrogation of Mr. Alvarado. The defense theory of the case was obviously this was a false confession, and that the facts that made up the alleged confession were actually known to Agent Stortz before interrogating Mr. Alvarado. The next point at which evidence came in was when the defense called Rebecca Lopez. And because of some witness problems, Ms. Lopez was taken out of order. The government had not finished its case in chief. However, the district judge did allow the defense to call Ms. Lopez to accommodate her schedule. So the defense put on Ms. Lopez, who was the sister of Mr. Alvarado. And on directed examination, defense counsel asked Ms. Lopez about her mother being in the hospital, among other things, but notably didn't ask anything about the hospital bills, who was paying for the hospital bills. The next time it comes up is on the redirect of Ms. Lopez, where defense counsel briefly talks about whether the brothers and sisters of Mr. Alvarado are helping to pay for those bills. And then the evidence really comes pouring in. On the recross of Ms. Lopez, who is a government attorney, the prosecutor begins asking Ms. Lopez whether Mr. Alvarado was working at the time of the arrest. And that's at excerpt of record at 415. Defense counsel objected to that. And Judge Benitez, the district judge, actually agreed, said, look, this looks like it's going beyond the scope. And again, that's at excerpt of record 415. And the prosecutor asked leave for just a couple more questions. And he's given that leave. And the other questions are whether the defendant was using his wages from the warehouse to help pay the hospital bills. And that was the question that the government attorney wanted to ask. It was then on, I guess, re-redirect that defense counsel felt obligated and the need to ask Ms. Lopez whether they were having trouble paying those bills or whether those bills were taken care of. Well, look, I guess what I'm having some trouble with, it's like it's sort of, it's not supposed to come in. Then a little bit comes in, but not much, you know, a little bit about the mother being in the hospital. Then pretty soon you got the sister, and then she says they're paying them, you know. So it just kind of is creeping up to it. And I guess I'm wondering what was the relevance, from the point of view of the defense, to ask the sister of undirect or redirect about the hospital bills at all? The relevance of the defense asking the sister on redirect was, and I guess it would have been re-redirect, was to try to shut down that implication that was raised by the government that this was a family that was having difficulty meeting those medical expenses. Because it looks as though by that time, when the evidence is coming in, that the government may actually argue that substantively this was a need that Mr. Alvarado had at the time. And I think it's worth noting, when you read through defense counsel's closing statement, to jump ahead all the way, he summarizes Ms. Lopez's testimony. And he summarizes why he called Ms. Lopez. He summarizes her testimony and how that helped the case. And nowhere does he, nowhere does defense counsel argue that you heard Ms. Lopez say that they didn't have, they weren't having problems paying for the medical bills. It's not something that defense counsel chose to argue in closing. And I agree with Your Honor that it does start creeping in. And then it's on the cross examination of Mr. Alvarado that a torrent just comes. And it does tie into this initial question that the prosecutor asked his sister about his work at the warehouse. On cross-examination of Mr. Alvarado, there's a long, long bit of questioning about whether he was employed at the time in this warehouse, whether it was November or December, whether he got fired. The prosecutor actually asked Mr. Alvarado whether or not he was fired from his job in the warehouse. The employer was sort of intermittently objecting and going back to the motion and Yes. Specifically, the excerpt of the record at 490, when the prosecutor asked Mr. Alvarado whether he had been fired, there was an objection, and the objection did reference a pretrial ruling. One can only assume that that, the pretrial ruling was on the invisibility department. I don't understand the relevance of all of this to begin with. Mr. Alvarado's fine. Either he committed the crime or he didn't commit the crime. I'm sorry. He either committed the crime and they meet the elements of the crime or he didn't, whether or not he was paying for his mother's hospital bills. I agree wholeheartedly. I don't think Mr. Alvarado's financial circumstances was relevant at all to whether he knew there was marijuana in the van. The district court said that the defense opened the door. The district court did. The district court was wrong. What was he relying on to say that? What was the question that the trial attorney asked that opened the door? From my reading of the record, I believe the district court was relying on the question that the defense counsel asked on the re-redirect of Ms. Lopez, the sister, about whether the family was having trouble paying for these medical bills. So it's your argument that you didn't know, the defense didn't open the door, the prosecution had already gone into territory it shouldn't have gone into? I believe, and yes, it is, and I believe the record bears that out. And even if, and I do want to go back to the very beginning when this subject was ever raised. It was in the government's case in chief during the direct examination of one of their witnesses, Agent Stortz. That's what started this. Defense counsel did not go into it in depth because I assume at that point defense counsel didn't think this was going to be an issue in terms of like the substantive argument that he needed money, he was poor, that's why he committed this crime. But that's exactly what it turned into. And I think that's reflected in the prosecutor's closing statement. At Excerpt of Record 566, his first substantive point, right after the introduction he's guilty, he met all the elements or he had proven all the elements, was Mr. Alvarado's apparent poverty. And the ambiguity, I mean, the sort of nonchalance that the government had, like, you know, it could have been the medical bills, it could have been that he had been fired or he was unemployed, he was unemployed, he just needed money, he throws out a laundry list of things, all of which relate to an apparent lack of money and that being a motive for the crime. And I think that's what makes it particularly objectionable because under this Court's case law, it's precisely that it cannot happen. Another time If we were to agree with you that it didn't rise to the level of the kind of destitute desperation of some of these other cases, the question in my mind then is, would it require reversal? It would, Your Honor, because I believe the vast majority of the instances when this testimony was coming in, there were timely objections and I think the issue was preserved. Moreover, I don't think this Court can hold that it's harmless because Mr. Alvarado's credibility was central to this case. The theory of defense was that it was a false confession and whether the jury believed Mr. Alvarado as he testified or not was what the case was all about. There was only one issue. It was about knowledge. And the defense case was substantiated in certain respects. The defense called Mr. Mendez-Creo, who was a band member of Mr. Alvarado's, and he testified and he corroborated that Mr. Alvarado was driving the van on a day in which his alleged confession said the van was with someone else, presumably having the compartment built. This band member also confirmed Mr. Alvarado's testimony as to why he had about $600, maybe $700 on him. It was payment from the concert that he had engaged in the night before or two nights before. There was also an issue of a gas tank in this case. And the reason I'm bringing this up is the defense had a good argument that this confession was spoon-fed, was not true, and was trying to demonstrate why it wouldn't be true. The band member went a long way to that. Another argument that the defense raised, which I think resounds, was that allegedly he's going to Los Angeles and this marijuana is built in a compartment that I guess took up some portion of the gas tank. The degree to which it took up that portion is unclear from the testimony. Also, Mr. Alvarado's story itself is a plausible story. He had a reason to be down in Mexico that was corroborated by his band member and also his own testimony. He went to a relative's house, loaned his car to a nephew. The nephew would have had sufficient time to load the marijuana into the van. And most importantly, the nephew knew exactly where Mr. Alvarado was going the next day, which was not too far over the border, which was to this swap meet named Santo Tomas. So the government tries to characterize this as a slam-dunk case, and confession cases can be difficult. But Mr. Alvarado's story made sense. It was internally consistent. And it was corroborated at certain points. And for that reason, I don't think the error of admitting the poverty evidence can be considered harmless. And I counted through the prosecutor's closing statement, first closing statement, one, two, four instances in which he discussed Mr. Alvarado's apparent need for money as a motive for committing the crime. And at Excerpt of Record 578, this is a quote, perhaps he was unemployed and needed money. That's exactly, it's something that might actually resonate with the jury. I don't know. But it's precisely the type of argument that shouldn't be made by a government counsel in a district court in the Ninth Circuit. If there are no other questions on the poverty issue, if I could move on, I would like to talk about briefly some of the extraneous information that came into Mr. Alvarado's trial, which just simply had no place in it. And I'd like to begin sort of chronologically, if I could, this idea that Mr. Alvarado may or may not have heard news accounts of other people being arrested at the border. The first time that this was brought up was on the cross-examination of Mr. Alvarado. And the government, in its brief, argues that the reason the prosecutor went through this line of questioning was to demonstrate that Mr. Alvarado knew that it was against the law to smuggle drugs and to rebut this idea of him as an, I think they used the term, unknowing dupe. First of all, I'm not sure his knowledge about whether it's illegal to smuggle drugs in the United States is relevant to anything. It's not an element of either of the crimes for which Mr. Alvarado was convicted. But also, he stated that he knew it was against the law. And it was after he stated that he knew it was against the law, and this is on cross-examination, that the prosecutor goes into, well, you've heard stories about seemingly innocent people caught. You've heard stories about seemingly people you would never think of that would have smuggled drugs being caught and found guilty. And although the last question about being found guilty, you've heard stories about people being found guilty, was thankfully stopped by the district court. The question was still out there, and it was the end of a three-question, a three-line question. Also, there's an issue of expert testimony in this case, and I won't go into it too in-depth because I see my time is running. But I would like to note that because the government argued it substantively in closing on more than one occasion, two occasions that I could find. And this idea, Agent Stortz, and this is, pardon me, this is in the rebuttal case, Agent Stortz at the end of redirect in the rebuttal case is asked by the prosecutor, in your experience, is it common for people to initially deny guilt and then ultimately confess? There's a timely objection. There's an objection on a number of grounds, expert testimony irrelevant and whatnot. And his answer is, yes, of course it's common. It happens all the time. Now, the government in its brief, I don't see the relevance of that. Whether other people smuggle drugs and whether other people, how their interrogations go is wholly irrelevant to Mr. Alvarado's knowledge of the marijuana. The government's response in its brief is that it was an explanation on the part of the government as to why Agent Stortz continued to interrogate Mr. Alvarado. As I mentioned in the reply brief, that rationale is nowhere articulated in the record that I could find. It's just never brought up. I thought they said it was modus operandi evidence, M-O, you know, modus operandi evidence, but it doesn't seem to be that either. I don't recall that argument. I certainly can't say from my memory right now that the argument wasn't made, and I apologize for that. But I believe the main thrust of their argument was that it was an explanation as to why Agent Stortz continued to interrogate Mr. Alvarado after he initially denied knowing that the marijuana was in there. And I think it's belied by the record, because the second substantive point in the prosecutor's closing was where, and this is an excerpt of Record 567, is where he says, well, you heard Agent Stortz testify that more times than not, people deny guilt and then confess. I mean, that's a pretty powerful statement. But it has nothing to do with Mr. Alvarado. It has to do with other people. And it certainly doesn't have to do with any reason why Agent Stortz may or may not have continued with the interrogation. It was expert testimony, because he was basing his opinion on his experience. It wasn't a question of a lay opinion through what he or she may have seen. It was unnoticed, although it was in the rebuttal case, and it just had no place in this trial. And the fact that it was used prominently in closing argument, I think, underscores the fact that it was important to the government. And with that, if there are no further questions, I'll try to save the last two and a half. That's fine. Thank you. Good morning, Your Honor. Good morning, Your Honors. Mary Phan for the United States. Turning first to the poverty issue, two points. First, poverty is bound up with the defendant's detailed admissions. The defendant told the agents after his arrest that initially he was offered a smuggling job. He declined. And then his mother was sick, and so he had to change his mind and took the job. Now, that's bound up with his admissions, and it falls within the exception of the case law for proof not of just mere poverty, but rather of desperation, of immediate and specific need. And that was the evidence of desperation. His mother was sick, and so he needed the money to pay her hospital bills. In fact, there was no evidence of that. He actually said this in his admissions. And, in fact, agents beyond that statement, there's nothing that suggests that he's destitute or there's some quick change in his circumstances. That he's not paying the bills and he's not paying his child's support. I mean, yes, he has obligations, but there's no evidence that he's not needing them. Right. The contours of his story shows the desperation. He initially says no by his own account. Then his mother falls. Then he needs the money. His mother falls ill. He changes his mind. That shows a level of desperation enough to change somebody's mind about taking an illicit job. And even apart from poverty, it wasn't so – poverty can't – poverty evidence can't be admitted to show motive. However, in this case, the defense, the main defense was false confessions. The level of detail in the defendant's admission is important to rebut that allegation of false confession. And that's why it's important to draw out the level of detail in the defendant's story. And that's just part of it. It's bound up in the defendant's story. You're saying that in an effort to rebut the false confession, you would be permitted to bring in the evidence of financial situation. I'm trying to get the legal hook here because this thing kind of moves around. Right. Theory. I'm saying that the mother's hospital bills wasn't admitted – it wasn't admitted only to show motive to commit the crime. It also goes to the detail of the defendant's story. It's part of the defendant's story. If you were to omit that part of the defendant's admissions, you omit a level of detail in the story. And it's important to show how much a defendant said to rebut that implication that it is a false confession. So you show that. You show that. You have this subject interview, and it comes in. Now, what was the reason for all the other – the child support and the other poverty evidence? Because you've got your level of detail here. Right. And as defense counsel noted, timing is important. And, you know, so mainly it's the mother's hospital bills, mother's hospital bills throughout the trial. Lopez, the defendant's sister, comes first on the cross-examination. The government focuses on the hospital bills. Then on redirect, the defense goes into the hospital bills for the purpose of showing a lack of need and to rebut that. Are you the trial attorney here? I'm sorry? Are you the trial attorney? No, I'm not the trial attorney, Your Honor. To that point, it seems like you've had this pretty extensive testimony on cross-examination about the hospital bills, and there are objections at that point. But the judge says it's coming in. So the defense doesn't have much choice but to ask the sister what the situation is on payment. Well, actually, this also goes to rebutting the false confession claim. It's very important to note that a component of the defense was that Agent Stortz fed, manufactured that motive. The defense, Mr. Alvarado, on his direct examination basically said that the agent wrote down that his mother's, that he needed money to pay his hospital bills, and that was how they kind of dressed up the admissions, the false admissions. And, in fact, on cross-examination of Agent Stortz, the defense goes into detail about Agent Stortz's training, saying, you know, you know that, you know, I did it. It's not enough. It's not enough. You have to dress it up a little bit. You have to have detail. And so it's so when on redirect of the sister, the defense suggests that there actually wasn't need, that kind of plays into their false confession defense as well. And so then the government is rebutting that as well by drawing out that there's actually. I'm sorry, but there's a number of, I've seen this now from the AUSAs in San Diego, and maybe it's just because the federal public defenders in San Diego are pointing all this out, but there's a number of places here where the trial attorney either crossed the line or came very close to crossing the line in violating clear Ninth Circuit law with the line of questioning. And I'm just wondering what the necessity is for that when you have this confession and, you know, creating all these possible errors, and then we're wrestling with, is it harmless? Okay, what was the other evidence in that trial as to knowledge? It really puts us, I mean, it's repeated. I was just suggesting that maybe you ought to, maybe they ought to have some seminars down there about, you know, what crosses the line in questioning and closing, because I've seen a lot of it this week from that office. So. Your Honor, I can't speak to the other cases. It puts us in an awkward position because we're looking at this going, well, this case says you can't do that, but is it harmless? So maybe you should say why, what was the, tell us what the proof was as to the knowledge, which was the only issue. Right. The evidence in this case was powerful. It was so powerful, and that's why the defense was so aggressive. And when you have a defensive, aggressive defense, sometimes if you read the record in isolation, it might seem the prosecution is aggressive when it's replying. But the evidence was powerful. We have detailed. I'm not saying the Federal Public Defender's Office isn't aggressive either. So I'm not saying they are an aggressive defense. Right. In this case, as to harmlessness, we have detailed admissions. You know, it's not just I did it. You know, it's not, this is not a story that was manufactured on the spot. The detail, the level of detail shows that.  We have the signed admissions by the defendants written down. The defendant actually ratified those admissions. We have the nervous demeanor of the defendant when he comes across the border. We have his kind of inconsistent, vacillating statements about ownership of the car as he crosses the border. We have the fact, his constantly shifting stories. We have the fact that even on cross-examination, when pressed as to the timing of the events, in his, you know, exculpatory story, how he kind of, he retreats. Well, first he says he's unemployed. First, rather, he says he was employed before. Then he says, oh, I wasn't employed. And that goes to timeline. Actually, that's the point that I wanted to raise as to employment. Employment was, the lack of employment was relative, was relevant, because it also goes to show the defendant is going back and forth as to whether or not he's employed. His sister said he was employed. He said he was employed. On cross-examination, when pressed on the timing, you know, how could you be in Mexico when you're working in Los Angeles, he backs up, oh, I'm not employed. And, in fact, the prosecutor in closing argued that, argued the fact of unemployment not to show motive only, but also to show, look, his story is not very plausible. He's employed. He's not employed. He says he's not employed because it's Christmastime, but he works at a factory. How can you not be employed at Christmastime? So it goes to, it's not just as to poverty as a motive, but also as to the implausibility of the whole story, how when pressed, the story kind of collapses. Turning, so we've covered why it's harmless and how the later torrent, as Mr. Rexroth says, actually comes out after. It's very significant that it comes out after the defense's redirect of Ms. Lopez, the defendant's sister. And also the whole, all the factors that come out, the fact that he's all of a sudden unemployed a month before the offense, that he has to pay the mother's hospital bills, even the child support, which the prosecutor didn't mean to elicit, which the judge so found, even all that just shows, you know, there's a confluence of circumstances that's putting him in desperate straits. And that kind of fits with his story about how he said no, he didn't want to do it, and then he had to change his mind in the end. Turning from poverty to the cross-examination of Mr. Alvarado, which Mr. Rexroth briefly addressed, first of all, of course, the standard of review is for abuse of discretion, and the Court, this Court has ruled that the extent of cross-examination is very much within the control of the district court, and there's a lot of deference given to the trial court in deciding what is relevant. Here, you know, I have to say, cross-examination is hard. It's a very delicate and difficult art. And as the Supreme Court said, United States v. Young, it doesn't unfold like a script in a play. You know, questions are formulated on the fly, basically, so it doesn't come out perfect. The meaning of what the prosecutor wanted to get at doesn't come out perfectly. But what the prosecutor did with regard to this question is about, you know, are you a member of society, don't you watch TV, et cetera, all that was to establish, you know, you're not some naive dupe who just doesn't know the legal system, would falsely confess, would be duped by your cousin. You know, you're a member, you're a long-time member of society and privy to all the things that we know as members of society. You're not just some naive person. You've been around. And so that's really what he wanted to get at. And that's why a lot of these objections in the district court didn't sustain the objections. When it seemed like maybe there was a crossing the line, the district court cut it off. And under Sarkeesian, even if there was any error, it would be harmless because it was cut off. The district court kind of gave his, rather than giving an imprimatur, he kind of, you know, showed, you know, don't regard that. So that was harmless, if there was any error. Next, as to Agent Stewart's testimony, and Mr. Rexford focused on the testimony in rebuttal redirect. And in that case, viewed in context, it's clear why it happened, right? So you have a long stretch of trial where the defense opens with its dramatic description of how basically the agents wore the defendant down by questioning for 15 to 20 minutes, calling them a liar. And it's important to note that the lies versus truth theme is a defense theme. They opened with lies versus defense. The government tried to – the agent, in fact, tried to stay away from those words lies versus truth. It was a constant defense theme, starting with opening, going to Agent Stewart's direct examination, first cross-examination, Mr. Alvarado's testimony. All of it was, you manufactured my admissions, you pressured me after persisting and I was feeling ill. And so, and it's very important to note that in the rebuttal case, when the defense did a cross-examination right before this contested portion of the transcript, the defense again launches into, you know, wouldn't you make false admissions if somebody had been harping on you for 15 to 20 minutes, calling you a liar? Again, playing on that theme. Right before that, then the prosecutor comes on for redirect. He's responding. He's responding to that second recross. And all he's trying to say is – all he's trying to do is give Agent Stewart an opportunity to explain, you know, no, I wasn't using my training experience to wear this guy down and make false admissions. I do this because based on my experience, you know, people don't just break down and just let it all out all of a sudden. You know, you have to persist in your questioning. And that's why it was relevant not to liken Mr. Alvarado to other defendants, but to explain and to rebut that implication of impropriety on the part of the agents. And at any rate, it's harmless because anybody, based on reason and common sense, knows that when somebody's caught doing something bad, they're not going to want to admit right away. They're going to deny. And then if you persist, perhaps they may admit. I mean, that's reason and common sense. And in fact, the prosecutor – So that's a good example of if it's so obvious, you know, why is – why are we having testimony on this subject as opposed to asking the jury to draw inference? I mean, it's kind of – not you, but one makes their own grave in these criminal cases sometimes by, you know, by fighting too hard when, as you say, it's obvious. It is based on reason and common sense. But I think it's important to note also that the agents were impugned throughout the trial for manufacturing false admissions. These are very serious allegations. And all the prosecutor wanted to do was give Agent Stortz an opportunity to rebut that implication based on his experience. But it doesn't create issues for appeal. If there is an issue – He's getting a brash repeal where he didn't need to. If there is an issue, it was harmless because – You've explained that. Right. Right. This Court doesn't have – unless this Court has questions for me, I'll submit. Thank you. Thank you very much. Thank you. Whether Mr. Alvarado's mother's medical condition was bound up in his admission, I would refer the Court to United States v. Romero-Avia. That's at 210 Fed 3rd, 1017. That's a case in which the defendant inadvertently during his – I believe his direct testimony said that he was unemployed. The government – It's a little different. I think you need to respond directly to the government's argument, which is this may not be your ordinary case because here the confession was the focus of the case. And part of the substance of the confession was the mother and her hospital bills. So would you address that directly? Certainly. The mother's hospital bills was, first of all, a small part of the alleged confession. And if it's part of the confession and if the government's theory really is to sort of prove that this alleged confession did indeed happen, there was sufficient – more than sufficient evidence for the government to make that argument. No one disputed that his mother was sick. The defense witness, Ms. Lopez, corroborated that the mother was sick and was in the hospital and the family was helping to pay those medical bills. Whether you have to hammer home that point that he was poor and needed money for the bills and then put on top of that, that he may have been fired from his job, was unemployed. And as the prosecutor said in closing, maybe he was unemployed and he needed money. That second layer is just unnecessary and gratuitous and not right. The child support. That came at the end of a long line of questioning by the government about whether he provided financial support for his wife and children. While Mr. Alvarado's statement that he had a child support order wasn't directly – he wasn't asked, do you have a child support order? It was certainly responsive to the prosecutor's question. I believe it was the third question in a line of questions on whether you provide financial support for your wife and children. That's responsive to that question. The whole line of questioning was objected to and was improper from the beginning. So I don't know the fact that he didn't specifically ask, hey, do you have a court order directing you to pay child support doesn't somehow make that answer okay in any sense. And this issue of most people at the border more than likely, more times than not, smuggle, I don't know how the government's question is responsive to the defense's question. I've heard the argument. I've seen it on papers and here now. And I just don't see how that's responsive. Thank you. Thank you. Thank both of you for your arguments this morning. The case of United States v. Alvarado is submitted and the court is adjourned.
judges: Hall, McKeown, Wardlaw.